JOHN FULLER ET AL. v. CHARLES H. RHODES, PRINCI-
PAL DEFENDANT, AND THE MICHIGAN CEN-
TRAL RAILROAD COMPANY, GARNISHEE
DEFENDANT.

*Chattel mortgages—After-acquired property—Future indebtedness
—Garnishment.*

In this case it is held that a chattel mortgage executed by the
principal defendant, and duly filed, to secure existing and
future indebtedness, and covering future acquired property,
and also all notes and accounts due or to become due the
mortgagor, which the mortgagees were authorized to collect,
was notice to the plaintiffs, and to all other persons, of the
rights of the mortgagees in the property covered by said mort-
gage; and that under it they are entitled to receive from the
garnishee defendant the sum of $600 due the mortgagor on
book account, arising largely from the purchase of posts, wood,
and ties which were owned by the mortgagor at the time he
executed the mortgage, it appearing that the mortgagees
intended to retain their lien on said property to secure the
payment of the indebtedness secured to them by said mort-
gage.

Error to Bay. (Cobb, J,) Argued October 18, 1889.
Decided November 15, 1889.

Garnishment. Plaintiffs bring error. Affirmed. The
facts are stated in the opinion.

*Shepard & Lyon,* for appellants, contended:

1. No title passes under a chattel mortgage, even though default
   is made in its conditions, but a foreclosure and sale is neces-
   sary to transfer the title; citing *Van Brunt v. Wakelee,* 11 Mich.
   177; *Lucking v. Wesson,* 25 Id. 443; *Haynes v. Leppig,* 40 Id.
   602.

2. The provision in the mortgage relative to the notes and accounts
   amounted simply to a power, and until acted upon by the
   mortgagees, and the proceeds reduced to their possession, such

notes and accounts were liable for the payment of the debts of the mortgagor; citing *Holmes v. Hall*, 8 Mich. 66; *Dalton v. Laudahn*, 27 Id. 529.

3. The mortgage, if not fraudulent at its inception, became such by the fraudulent use made of it by the mortgagees. It made a debtor with ample property to pay his debts practically insolvent, and the mortgagees endeavored to control the property for his benefit in such a manner as to defeat the claims of creditors.

*Edgar A. Cooley (J. L. Stoddard,* of counsel), for defendants, contended:

1. Where it is not claimed that there was no evidence tending to support findings of fact, a bill of exceptions becomes immaterial, and should not be examined; citing *Scotten v. Sutter*, 37 Mich. 526; *Johnson v. Crispell*, 43 Id. 261; *Farrington v. Sexton*, Id. 454; *Kane v. Stowe*, 50 Id. 317; *Kundinger v. Railway Co.*, 51 Id. 185.

2. The court will only ascertain whether the conclusion of law is a correct deduction from the facts found, or, more properly speaking, whether, upon the facts found, the plaintiffs are entitled to a judgment; for, unless the facts found entitle plaintiffs to a judgment, they have failed to make a case, and judgment must pass for the garnishee defendant, as no additional facts can be presumed; citing *Mitchell v. Chambers*, 43 Mich. 150, 158; *Johnson v. Crispell*, Id. 261; *Randall v. Randall*, 37 Id. 563, 570; *Leitelt v. Parker*, 48 Id. 297; *Robinson v. Smith*, 63 Id. 350.

3. Fraud is a question of fact, and even where there is evidence tending to show fraud, unless the trial court finds that there was in *fact* fraud, it cannot be presumed to exist; nor has this Court any jurisdiction to review the findings in respect thereto; citing *Johnson v. Crispell*, 43 Mich. 261.

LONG, J. Plaintiffs in February, 1888, brought an action of *assumpsit* against defendant, Charles H. Rhodes, in the circuit court of Bay county, and on February 29, 1888, a writ of garnishment was issued out of that court in the cause, directed to the Michigan Central Railroad Company as garnishee. Disclosure was made by the railroad company, admitting an indebtedness of $600. Afterwards a second disclosure was filed by the garnishee,

also admitting the indebtedness of $600, but disclosing that the moneys were claimed by W. I. Brotherton & Co., on the ground that they had a chattel mortgage bearing date December 9, 1887, upon the property sold to the garnishee by the principal defendant, and upon the proceeds thereof.

The cause came on to be heard before the court without a jury, and W. I. Brotherton & Co. appeared, and took charge of the defense, and contested the right of the plaintiffs to recover from the garnishee. The circuit court, at the request of the plaintiffs, made written findings of fact and conclusions of law, as follows:

"That on December 9, 1887, Charles H. Rhodes was, and for many years had been, a resident of Bay City, in Bay county, and engaged in the business of making, buying, and selling railroad ties; wood, posts, and other forest products; that said Rhodes procured said ties partly from his own lands, and partly by purchase, and had at all times considerable quantities thereof on hand, and in process of manufacture, at different points along the Michigan Central Railroad and its branches, from Kawkawlin, in Bay county, north to the Straits of Mackinaw, and on December 9, A. D. 1887, he had a considerable quantity of such ties on hand; that all the ties so purchased or manufactured by said Rhodes were by him sold to the said garnishee defendant in this cause, the Michigan Central Railroad Company, and those which he acquired by purchase were hauled out of the woods to points along the line of said railroad, and there inspected from time to time by the inspectors of said garnishee defendant; and such inspection was the basis, not only of the settlement between said Rhodes and said garnishee defendant, but also of the final settlement between said Rhodes and his vendors, but he usually paid for them on estimates made previous to such inspection; and when such payment was made the ties were marked with his mark, and were, as between himself and his vendors, treated and considered as his property, the estimates being subject to correction when the inspection should be afterwards made.

"That on December 9, A. D. 1887, said Rhodes was

indebted to W. I. Brotherton & Co., a copartnership composed of W. Irving Brotherton, Henry N. Watrous, Orville A. Watrous, and Henry W. Jennison, and doing business at Bay City, in the sum of six thousand four hundred and eighty-nine dollars and ninety-four cents ($6.489.94), and on that day, and in order to secure the payment thereof, and of such indebtedness as he might afterwards incur to them, said Rhodes executed and delivered to said W. I. Brotherton & Co. a mortgage, a copy of which is appended hereto, and made a part hereof; and on the 22nd day of the same month said mortgage was duly filed in the office of the recorder of said Bay City, said city having no officer known as city clerk.

"That, after the making of said mortgage as aforesaid, said Rhodes continued to purchase from W. I. Brotherton & Co., from time to time, supplies to use in the prosecution of the work of getting out such ties and other forest products, and also from time to time made payments in the manner hereinafter shown, to apply on his indebtedness to them;. so that on February 29 his indebtedness to them amounted to nine thousand three hundred and five and 86-100 dollars ($9,305.86), and it now amounts to nine thousand three hundred and twelve and 6-100 dollars ($9,312.06).

"That said Rhodes had an account at the Bay City Bank, in Bay City, and was, at all times, allowed to check against said account, and said bank from time to time made advances to him on said account, to enable him to carry on his business, and the following course of dealing was established between said Rhodes and said bank, viz.: Said bank paid at maturity all papers given by said Rhodes to said W. I. Brotherton & Co., and all paper given by him to other persons, in the prosecution of his said business, and checks drawn by him for money used in said business, and said bank relied upon the monthly sales of ties and timber, hereinafter mentioned, to make said account good and repay advances.

"That once in each month said garnishee defendant paid for all the ties and timber purchased of said Rhodes during the preceding month, and, whenever the amount of any monthly payment about to be made was ascertained, said Rhodes ordered the same to be paid to said bank, and it was so paid, and was by said bank placed

to the credit of said Rhodes in his said account. Said Brotherton several times asked said Rhodes why he (said Rhodes) did not give the orders for said monthly payments to said W. I. Brotherton & Co., instead of giving them to said bank, and was told by said Rhodes, in reply, that the cashier of said bank wanted the money paid to the bank because the bank was taking care of the paper given by said Rhodes to said W. I Brotherton & Co., and was to make advances to said Rhodes, and was willing to make such advances if said Rhodes would give it the said orders on said garnishee defendant, and notify the cashier from time time of the amount of ties on hand so that the repayment of such advances would be secure, and thereupon said Brotherton consented to the giving of the orders to the bank, as aforesaid, and the same course of dealing was continued; said W. I Brotherton knowing of such sales, and consenting thereto, on condition that the notes of said Rhodes given to them from time to time, and his indebtedness to them on account, were paid at maturity, but always intending to retain their lien on the ties and timber sold, or the proceeds thereof, to secure the payment of the indebtedness of said Rhodes to them, all of which was distinctly understood between them and said Rhodes. But there was no understanding or agreement whatever between said garnishee defendant and said W. I. Brotherton & Co. relative to such sales, or the application of the proceeds thereof.

"That whenever said bank received money from said garnishee defendant, as aforesaid, the same was by said bank first applied to pay advances made by the bank to said Rhodes, paper given by said Rhodes to the said W. I. Brotherton & Co., and paper given by him to other parties for the purchase of supplies used in his said business, and the balance, if any, remained to the credit of said Rhodes, and was used by him in said business, but usually there was no such balance remaining; and I do not find that there was any such balance remaining of the money paid in during either of the months of December, January, February, or March, but I do find that, if there was any such balance remaining during either of these months, it was only in one of those months, and was only a small amount.

"That during the month of December, A. D. 1887, said Rhodes sold to said garnishee defendant—

Posts amounting to _____$    6 30
Wood amounting to _____    3 75
Ties amounting to _____ 5,972 43
                                                   ─────────
    Making a total of _____$5,982 48

"All of which was by said garnishee defendant, on the order of said Rhodes, on January 16, paid to said bank, and then applied in the manner above described; that during the month of January said Rhodes sold to said garnishee defendant—

Wood amounting to _____$   236 60
Ties, at 18 cents each, amounting to _____ 12,299 70
                                                   ─────────
    Making a total of _____$12,536 30

"All of which was, on the order of said Rhodes, on February 14, paid to said bank, and then applied in the manner aforesaid; that during the month of February said Rhodes sold to said garnishee defendant—

Posts and wood amounting to _____$   438 12
Ties, at 18 cents each, amounting to _____  5,501 32
                                                   ─────────
    Making a total of _____$5,939 44

"All of which, excepting six hundred dollars ($600), which was retained to await the result of this suit, was, on the order of said Rhodes, on March 17, paid to said bank, and there applied in the manner aforesaid.

"That at the time of the making of said mortgage said Rhodes owned all the wood and posts, and more than half of the ties, included in said sales of December, January, and February, and, of all the ties which were included in the sales of said months, about four-fifths were acquired by purchase, and not manufactured from his own lands; that on or before February 29, A. D. 1888, said plaintiffs commenced suit in this court against said Charles H. Rhodes, to recover certain moneys alleged to be due to them from said Rhodes, and on the said 29th day of February the garnishee summons in this cause was served on the said Michigan Central Railroad Company, and the $600 mentioned in the disclosure and amended disclosure on file in this cause is the same $600 hereinbefore mentioned, and is part of the proceeds of sales of ties and wood sold by said Rhodes to said garnishee defendant in the month of February; and on

May 17, A. D. 1888, said plaintiffs recovered judgment in said original suit against said Rhodes in the sum of $525.75.

"And counsel for said plaintiffs, having requested that I find, further, as follows, viz.:

'1. That it appears from the files and records that the judgment against principal defendant was on notes given to plaintiffs in 1884.

"2. That the firm of W. I. Brotherton & Co. kept no record of the quantity of ties sold; that they permitted Rhodes to make sale of the ties, and knew that he was so doing.

"3. That the defendant sold to the Michigan Central Railroad Company ties every month, varying from two thousand to to fourteen thousand dollars.

"4. That defendant put these ties upon the railroad track at different points, between Kawkawlin, near Bay City, and Mackinaw; that he had from seventy-five to two hundred contractors making ties.

"5. That Rhodes checked right along on the Bay City Bank, and, when the money was paid in on the orders, the money was credited up to his account; Rhodes had control of it.

"6. That defendant had control of the money arising from the sale of ties, placed in the Bay City Bank; that with it he paid the notes that Brotherton & Co. had indorsed for him; then paid notes given by him to others, and drew checks upon it, and continued to draw checks upon the bank when no funds were to his credit; that they were honored, and, as the money came in from the sale of ties, it was credited upon his account.

"1. In response to the first of said requests, I refuse to find as therein requested.

"2 and 3. In response to said second and third requests, I do find the facts to be as therein stated.

"4. In response to said fourth request, I find that the general course of business of said Rhodes was as therein stated.

"5 and 6. In response to said fifth and sixth requests, I do not find as therein requested, excepting such facts therein stated as are embraced in my general findings above.

"And said counsel for said garnishee defendant having requested that I further find as follows, viz.:

"That said Rhodes sold said ties to said garnishee defendant at a uniform price of 18 cents apiece, and those which he acquired by purchase were hauled out of the woods to points along the line of said railroad, and were counted up by said Rhodes, or by a man

employed by him for that purpose, either before or after they were hauled out, and when counted were marked with said Rhodes' mark, and a delivery thereof taken, and payment therefor made,. by said Rhodes, and, as between himself and his vendors, said ties were thereafter treated and considered as his property. Said ties were from time to time inspected after being so hauled out, for the purpose of ascertaining whether there were any unmerchantable pieces among them, by inspectors of the said garnishee defendant, and such inspection was the basis, not only of the settlement between said Rhodes and said garnishee defendant, but also of the final settlement between said Rhodes and his vendors."

"In response to such request, I find the facts to be as therein stated, except as to the price of the ties sold, and, as to the price, I find that those sold in December and January were sold for 18 cents each.

" And from the facts so found, I find, as conclusions of law, that said ties, and other timber so as aforesaid sold by said Rhodes to said garnishee defendant, in the months of December, January, and February last, and the proceeds of the sale thereof, were subject to the lien of said mortgage, and that said W. I. Brotherton & Co. are entitled to receive said sum of $600, mentioned in the disclosure and in the amended disclosure in this cause.

" Judgment will therefore be entered in favor of said garnishee defendant, and against said plaintiff, with costs to said garnishee defendant to be taxed, including an attorney fee of twenty-five dollars."

Exceptions were filed to this finding. Judgment was entered in favor of the garnishee defendant. Plaintiffs bring error.

Twelve errors are assigned.

The seventh to the twelfth, inclusive, charge that the circuit judge was in error in not finding the facts as claimed by the plaintiff, and in finding the facts as stated. The errors relied upon here, however, relate to the conclusions of law arrived at by the trial court.

Counsel state in their brief that the conclusions of law of the circuit court were erroneous, and that the facts as found by the circuit court, and shown by the testimony, and set out in the bill of exceptions, entitle

the said plaintiffs to a judgment for the amount specified in the disclosure; that the money due from the garnishee defendant to Rhodes was not, at the time of the service of the writ of garnishment, subject to the lien of W. I. Brotherton & Co.'s chattel mortgage, and that W. I. Brotherton & Co. were not entitled to recover that sum to the exclusion of the rights of the plaintiffs. We think, however, that the court was not in error in its conclusions of law, under the facts found. The mortgage under which Brotherton & Co. make claim to this fund states an indebtedness to them from Rhodes of $6,489.94, and provides:

"Whereas, the said party of the first part desires to purchase goods, wares, and merchandise, from time to time, from said second parties, upon credit:

"Therefore, in consideration of the premises, and of the sum of one dollar ($1.00) paid by said second parties to said first party, the said party of the first part hereby sells, assigns, and transfers and mortgages, to the parties of the second part, all of the following goods, chattels, and personal property, viz.:

"All the stock in trade, goods, wares, merchandise of every kind and description, and all furniture, counters, scales, desks, lamps, chandeliers, show-cases, safe, and all fixtures, goods, and personal property, situated in and about the general store occupied by said first party, and in which he is carrying on business, at Pinconning, Bay county, Michigan; also all delivery and other wagons, and sleighs, horses, harnesses, and buggies owned by first party, or in which he is any way interested; also all logs, timber, lumber, ties, shingles, and wood, wheresoever situated.

"Also the shingle-mill at Mansfield's Station, on the line of the railroad leading from Pinconning to Gladwin, and heretofore known as the 'Saginaw Bay & Northwestern Railroad,' in Bay county, in said State, and now or heretofore operated by said party, and all machinery, belts, belting, tools, and implements used in or about said shingle-mill, and all other goods, wares, merchandise, and personal property, of every kind and description (excepting household furniture), situated in the dwelling

occupied by first party, at Bay City, aforesaid, owned by said party of the first part, or in which he is in any manner interested, wheresoever situated, and all goods, wares, merchandise, and personal property of every description hereafter purchased, owned, or held by said first party, or in which he is in any way interested, including, particularly, all shingles that may be hereafter manufactured, and all logs, timber, and lumber, hereafter cut or manufactured, by or for said first party, as well as all goods, wares, merchandise, and personal property hereafter placed in said store, or added to said stock, and all property of every kind at any time in transit.

"Also all notes, accounts, drafts, bills of exchange, now due or to become due to first party, and all such as may be hereafter contracted in his favor in and about the business at any time being carried on by said first party or otherwise, together with all books of account of every description, now or hereafter owned or used by first party,—the said second parties being authorized to collect and receive the moneys due or to become due to said first party at any time, on any and all accounts, notes, drafts, and bills of exchange, and apply the proceeds as hereinafter indicated.

"To have and to hold the same to the said parties of the second part forever.

"Provided, always, and the condition of this obligation is such, that if the said party of the first part pay, or cause to be paid, the aforesaid indebtedness of six thousand four hundred and eighty-nine dollars and ninety-four cents ($6,489.94) or thereabouts at or before the expiration of one year from the date hereof, and shall pay at maturity all bills and accounts hereafter contracted with said second parties by him, and all negotiable paper hereafter given by said first party to said second parties for goods, wares, or merchandise, or upon any valuable consideration, and all negotiable paper hereafter given by way of renewal of any such paper, either heretofore or hereafter given by him as aforesaid, including all negotiable paper heretofore and all that hereafter may be given by said first party as aforesaid, that has been or shall be indorsed by said second parties, and transferred or negotiated by said second parties or by the first party, and shall keep and perform all the covenants and conditions herein contained on the part of the said party of the first part, then this obligation to be void; and the

said party of the first part agrees to pay the same accordingly. *   *   *   *   *   *   *   *

"The party of the first part also agrees to replenish and keep up his stock of goods aforesaid, so that the security hereunder shall be ample and satisfactory to said second parties, and he shall not sell or dispose of the same, or of any part thereof, except in the usual course of retail trade.

"In case default is made in the payment of the indebtedness aforesaid, including as well that heretofore as that hereafter contracted, or of any part thereof, or in the payment of the negotiable paper aforesaid, or any part thereof, including that heretofore as well as that hereafter given, or in keeping up such insurance, or in keeping up the stock as aforesaid, or in any of the covenants or conditions herein contained on the part of said first party, or if said first party shall at any time sell, assign, or dispose of or move the whole or any part of said property, except as hereinbefore specified, or if the 'said second parties at any time deem themselves insecure or unsafe, then, in any such case, it shall and may be lawful for the parties of the second part, their representatives or assigns, to enter upon the premises aforesaid, or any place or places where said property, or any part thereof, may be, and seize and take possession of the whole, or any part thereof," etc.

This mortgage covers all notes, accounts, drafts, bills of exchange, etc., due or to become due, and authorizes said second parties to collect and receive the moneys thereon. It appears that the account due to W. I. Brotherton & Co. by Rhodes amounted to $9,305.06 at the time of the service of the writ of garnishment, and that the amount of $600 owing to Rhodes from the Michigan Central Railroad Company on that date was on book-account arising largely from the purchase of posts, wood, and ties, which were owned by Rhodes at the time of the execution of the chattel mortgage, and by the terms of which they had a right to demand and receive the money due to Rhodes on account. This mortgage was on file, and therefore was notice to the plaintiffs and to all other

persons of the rights of Brotherton & Co. in not only the property Rhodes had on hand at the time of the execution of the mortgage, but such as he might afterwards acquire, together with notes, drafts, and accounts which might thereafter be made.

It cannot be said, under the findings of fact of the trial judge, that Brotherton & Co. had ever waived this right, as the court finds that they intended to retain their lien on the ties and timber sold, or the proceeds thereof, to secure the payment of the indebtedness of Rhodes to them. The course of dealing between W. I. Brotherton & Co., Rhodes, and the bank could not affect the rights of W. I. Brotherton & Co. to demand and receive from the railroad company the amount due on this account, under the finding of the circuit judge that they did not intend to release their lien upon the property or its proceeds.

This controversy is not between Brotherton & Co. and the railroad company, or the bank, where Brotherton & Co., by a course of dealing in permitting Rhodes to draw from the funds deposited in the bank by the railroad company, to carry on his business, might be estopped to claim from the railroad company or the bank moneys paid on account to Rhodes, but by one who is not in a position to claim any such equities, and who had full notice of the Brotherton & Co. claim. By the terms of the mortgage, Rhodes was to have the right to sell in the ordinary course of trade, and it was expected that, so far as the dealing in wood, posts, and ties was concerned, he would sell on credit; but Brotherton & Co. at all times, by the terms of their mortgage, could demand and secure the moneys due on account of such sales. They have demanded it here, and must be held to have rights superior to the plaintiffs under their garnishee process.

We find no error in the conclusions arrived at, under the facts found by the circuit judge, and the judgment must be affirmed, with costs.

The other Justices concurred.